Appellant's sole contention for a reversal of his conviction for burglary in the second degree is based upon the denial of his motion to suppress as evidence two items of personal property that had been stolen from the burglarized premises, which were later found by officers on a warrantless search of a hotel room in which appellant was the registered guest. He insists that the search was in violation of the Fourth Amendment to the Constitution of the United States. He asserts two separate reasons for his insistence: *Page 1070 
 1. That appellant was unlawfully arrested and that such unlawful arrest vitiated any claimed right to conduct the search.
 2. That appellant did not validly consent to the search.
Notwithstanding the strong undisputed circumstantial evidence of defendant's guilt, we recognize the seriousness of the questions raised by appellant's industrious counsel and proceed to a determination thereof in the light of the extraordinary circumstances surrounding the search.
It was established by the evidence that on the night of March 19-20, 1979, the building from which W.V. Brown Lumber Company, Inc., a corporation, conducted its business was broken into and entered, and a large amount of personal property belonging to said company and Bill Brown's Saw Mill, Incorporated, was taken therefrom. Included were a calculator, a typewriter, a check writing machine and some blank checks. The blank checks had the name "Bill Brown Saw Mill, Incorporated," printed thereon. The burglarized building was in Briarfield, Bibb County, Alabama.
Ms. Freeman testified that on March 21 or 22, 1979, while working as cashier for Food World in Riverchase, Jefferson County, she placed her mark of approval on a check presented by a person whom she identified as the defendant, which check was identified by an official of Bill Brown's Saw Mill, Incorporated, as one of the checks missing from the burglarized building the morning thereafter. The check showed in printing the name of "Bill Brown's Saw Mill, Inc." and was purportedly signed in handwriting by Bill Brown. Printed thereon was "Pay to the order of" and immediately thereafter there was stamped thereon "Theodore Mitchell." The check was endorsed "Theodore Mitchell" in handwriting prior to the presentation of the check to the cashier at the store. Ms. Nancy Davis testified that on or about March 21 or 22, 1979, while working as cashier for Food World in Pelham, Shelby County, Alabama, she took in for merchandise a check from defendant for a different amount but in all other respects similar to the other check. Bill Brown testified that his purported signature to the checks was false. Both checks were returned by the drawee bank through banking channels to the respective stores.
Mrs. Sarah Moore, who lived in Montevallo, Shelby County, Alabama, testified that on the night of March 19, 1979, defendant and her cousin Irvin Cottingham borrowed her automobile. She said that the next morning she observed at her house some things that had not been there previously, including a typewriter, an adding machine, some "other type machine" and a check. She said she asked defendant "where they came from" and that his answer was, "he said wasn't nothing to hurt me. Never did say where came from." She told him to "get it out" and that defendant did so "that day or that afternoon."
Irvin Cottingham, who had also been indicted for the same burglary, testified that he and appellant went to Brown Lumber Company the evening of March 19, 1979, that he let the appellant out of the automobile and at appellant's direction drove around the block and after doing so the second time, he saw appellant at the fence of the lumber company. According to the testimony of Cottingham, appellant had one "big machine" and some others; he helped appellant put the big machine over the fence and in the automobile. He saw a typewriter, and an adding machine and something else. He also saw some checks. They took the items to the house of his cousin. He left soon thereafter and went to the home of his grandmother in Montevallo, with whom he was living at the time. He said he saw appellant the next day; appellant asked him to sign two or three checks by the name "Bill Brown" and the name "Theodore Mitchell" thereon, which he did. He further testified that two or three days after he wrote the names on the checks he and appellant went in Cottingham's automobile to Montgomery and from there to Mobile, where they were arrested and were afterwards returned to jail in Bibb County.
According to the testimony of Henry Vernon Rothe, III, of the Mobile Police *Page 1071 
Department, the arrest of appellant and Cottingham took place in Mobile after he had seen an automobile driven by appellant, and also occupied by one he afterwards determined was Cottingham driving to the left of the center line of a two-way street in Mobile. He signaled the automobile down which led to a series of developments, which will now be narrated so as to present the circumstances surrounding the search of appellant's hotel room and the seizure of a stolen calculator and typewriter, as to which the court overruled defendant's motion to suppress as evidence.
There was a hearing on the motion to suppress out of the presence of the jury. The evidence on the hearing on the motion to suppress consisted exclusively of the testimony of Officer Rothe. The court announced its ruling on the motion by stating that it did not think that "it was an unreasonable search and seizure." Thereupon the in-camera hearing was concluded and Officer Rothe continued with his testimony in the presence of the jury. At the conclusion of his testimony and of the short testimony of a witness who identified the calculator and typewriter as items taken from the building at the time of the burglary, the items were received in evidence over the objection of defendant.
According to the only testimony as to what occurred between the time the automobile which was being driven by defendant at the time he was signaled down by Officer Rothe and the search of appellant's hotel room and discovery of the calculator and typewriter, Officer Rothe drove up to the stopped automobile, a 1970 Lincoln Continental, which was being driven by appellant at the time of the traffic violation, but which was owned by Irvin Cottingham; Officer Rothe asked appellant, the driver, for his driver's license. Appellant handed him a license which had the picture of appellant thereon, which the officer recognized as a picture of appellant, but the name thereon was not the name of appellant. The name thereon was the name "Irvin S. Cottingham." Before there was any effort to formally arrest and further detain appellant, Officer Rothe "ran a check to make sure there was nothing outstanding on the subject." He received a reply from N.C.I.C. [National Crime Information Center] that there was "a state-wide pickup for a traffic attachment from Montevallo Police Department." He learned that there was an outstanding warrant for a traffic violation by Irvin S. Cottingham, the man whose name was on the Alabama State Driver's License the appellant handed the officer and which had on it the picture of appellant. Upon observing the persons in the automobile, the officer saw a billfold in open view on the front seat of the automobile that was in addition to the billfold that contained the mentioned driver's license. The billfold on the seat had on it the name "Irvin S. Cottingham." The officer then placed appellant under arrest, and the officer's testimony continued as follows:
 "A. I tried to ascertain from Mr. Cottingham, the real Mr. Cottingham's identification. He informed me that his name was Scott Harell. He gave me a date of birth and I asked him to give me his Social Security number. He said he had never had a Social Security number. I asked him where he lived and he said he lived in Montgomery yet he wasn't able to produce an address. I asked him where he lived before Montgomery and he said he lived in Brooklyn, New York. He was unable to answer some simple questions about New York City.
". . . .
 "Q. All right. Now, after you took him in custody, did you take their car into your police station?
 "A. I inventoried the automobile and towed it in. That's the policy of the police department there. I had them in custody.
 "Q. What was the occasion for you going to the department?
 "A. Well, there's a lot that leads up to that. Do you want to skip and go to it or finish?
 "Q. Just whatever the occasion was for you to going to the department.
". . . . *Page 1072 
 "A. Well, we went to the Detective Bureau and I was more worried about Mr. Harell's true identification than the traffic attachment on Mr. Mitchell. He was still unable to answer any real questions and I asked him what he did with the billfold that I had retrieved, which had identification belonging to an Irvin S. Cottingham and I believe about $80 in U.S. currency. I gave that billfold to him when I towed the automobile. I believed him to be Mr. Cottingham and I was highly suspicious of anyone having two wallets with two sets of identification and sums of money in each.
 "Q. Now what occasion or how does that relate with the occasion of your going to the apartment?
"A. Okay. I asked Mr. Mitchell —
"Q. (Interposing) This man here?
"A. That's correct.
 "MR. GREENE: (Interposing) Believing him to be Cottingham?
 "THE WITNESS: Believing him to be Cottingham. The real Mr. Cottingham who had rented the motel room they were staying at. Mr. Mitchell implied that he had. At that time I asked him if we could have him sign a Consent Search Form allowing us to go and look in the room to find any identification which would substantiate Mr. Cottingham's claim to be —
 "Q. (Interposing) Let me stop you right there. Where did this take place, at the police station?
"A. That's correct.
 "Q. And were you aware of his address at the police station? They tell you what his address was while you were at the police station? Did he inform you of his address?
 "A. Yes, sir. He said he was staying at the LaGrander Hotel."
Officer Rothe further testified that soon after the patrol car arrived at headquarters with the men, a marijuana cigarette was found in it. He said that a short time after appellant and the real Cottingham had been brought to police headquarters, he had asked appellant if he would consent to a search of his hotel room, telling him that he needed to learn more about the identity of the two men in custody and to learn if there was any more marijuana in the hotel room. Appellant declined to give him his consent; he refused to sign a consent form. Soon thereafter, however, according to Officer Rothe, appellant "stuck his head out the door and said, `If I sign it, can I go with you?'" The officer said he then told him that it was his intention to take him because "we wanted to bring his property back so it would not be left unattended in the hotel or motel room." The appellant then signed the consent form, which was witnessed by the real Cottingham, who continued to go by the name of Harell. Cottingham was then placed "in jail for marijuana personal use." While doing so, appellant ran out of the building and "several moments later he was apprehended at the bus station, the Greyhound Bus Station." Thereafter, without any indication by appellant that he was withdrawing his consent he gave to search his hotel room, Officer Rothe accompanied by another officer and appellant, went to the hotel room. Officer Rothe opened the room with the key provided by appellant. In the room were found the calculator and the typewriter, as well as many other items, including a packet of marijuana.
In insisting that the arrest of appellant to the extent of his being taken to jail and booked was an illegal arrest, he relies largely upon Code of Alabama, 1975, § 32-5-310, pertaining to arrest procedure and the enforcement of laws relating to motor vehicles, which provides that the officer may arrest if the offense be committed in his presence and further:
 "If the arrest be made without warrant, the accused may elect to be immediately taken before the nearest court having jurisdiction, whereupon it shall be the duty of the officer to so take him. If the accused elects not to be so taken, then it shall be the duty of the officer to require of the accused a bail bond in a sum not to exceed $300.00, conditioned that the accused binds himself to appear in the nearest *Page 1073 
court having jurisdiction at the time fixed in the bond."
If nothing had occurred theretofore other than that appellant had violated the law in driving the automobile on the wrong side of the road, it is clear that the officer would have exceeded his lawful authority in not releasing him on his own bond as provided by the quoted statute. In fact, the evidence shows that if nothing more were then involved than the traffic violation, the particular statute would have been punctiliously observed. Much more was involved. It called upon an officer to do more, in the performance of his duty as an officer, than he is required and expected to do when nothing more than the violation of a traffic law is observed by him. Before actually taking appellant and his companion in custody, the officer had learned that the person whose name was on the driver's license was wanted in Shelby County on a warrant for a violation of a traffic law. The officer was not able to fathom the deception that both appellant and Cottingham were perpetrating, but he had good reason to believe that neither the driver nor the other person in the automobile made known to him his identity. The right that one has to make his own bond for a traffic violation cannot within reason be said to extend to one who having committed a traffic violation is reasonably believed to be concealing his identity, so that his bond would be worthless. This is exemplified by the fact that at the time, defendant was being sought on a warrant for a traffic violation. The quoted provision of Code of Alabama, § 32-5-310
is not applicable to the circumstances of the instant case. The arrest of the appellant was not unlawful.
A warrantless search does not constitute the violation of one's Fourth Amendment right if he has given his consent to such a search, voluntarily, intelligently and knowingly.Daniels v. State, 290 Ala. 316, 276 So.2d 441, 443 (1973); Cookv. State, 56 Ala. App. 250, 320 So.2d 764 (1975); Welden v.State, 57 Ala. App. 379, 328 So.2d 630 (1976).
A person who registers for a hotel room may give legal consent to its search. Bridges v. State, 52 Ala. App. 546,295 So.2d 266 (1974).
There was no testimony, express or implied, that appellant's consent to the search of his room was not voluntarily, intelligently and knowingly given. The only reasonable conclusion from all the circumstances is otherwise. There was no deception practiced on appellant. The fact that he at first refused to give his consent is no evidence of involuntariness; especially is this true in view of his subsequently volunteering to consent to the search on the condition that he be allowed to be present when the search was made. It could be argued, but with little foundation, that at such time he was planning to escape. In answer, it could as reasonably be said that when he was apprehended after his attempted escape, his failure to withdraw his consent was more consonant with voluntariness than contrary thereto. Furthermore, he had reason to believe that by being allowed to be present at the time of the search of the room, he could conceal, or divert the attention of the officers from, any marijuana in the room, which otherwise he could not do if the officers were allowed to take their time and procure a search warrant. Moreover, he had reason to believe that the officers at that time had no information as to the burglary and that they at that time had no interest whatever in any of the various items of personal property in his room. There is good reason to believe that he chose what he thought was for his best interest, and such being true, it is not reasonable to assume that his consent was not voluntarily, intelligently and knowingly given. He didn't gain by it, but he thought he could.
We must qualify what we have just stated that appellant "didn't gain by it." It appears that he probably did, as indicated by portions of the record before us inserted therein by action of defendant, in which it was contended by defendant on the trial that he was detained in the Mobile jail and charged with a felony in the possession of *Page 1074 
marijuana in his hotel room and that he was discharged on that charge by the District Court of Mobile County on the ground that there was an illegal search and seizure of the marijuana in his room. The contention was also made that the district court had discharged him on a contemporaneous charge of buying, receiving or concealing stolen property found in his hotel room, not property, however, involved in the burglary of the Brown Lumber Company, but property involved in a burglary in Montgomery County, and that the district court discharged him on that case on the same ground of an unlawful search of the hotel room and seizure of the property that had been stolen in Montgomery County. His contention in this respect was in general corroborated, although not conclusively established, by correspondence from the judge presiding in such cases in the District Court of Mobile County and by copies of transcripts of the records in those cases. Defendant contended on the trial of the instant case that such action in the two cases in the District Court of Mobile County required a similar ruling by the trial court in the case now under consideration, insisting that such a ruling was required by analogizing the situation to those in which a defendant has prevailed on principles of resjudicata, collateral estoppel, former jeopardy, autrefoisacquit or the like. As appellant does not present such a contention on appeal, and for the reason that the inconclusive state of the record on the subject is such that an appellate court should have the benefit of the respective contentions of the parties on the facts and on the law before any determination of such issue, if any, we forego it at the present time, having in mind that if it should be determined, it can be done on application for rehearing by either of the parties aggrieved by the judgment and opinion of this Court.
Irrespective, however, of a deferment of the question as to the rulings of the District Court of Mobile County, portions of the record as to such rulings give a significant insight, we think, into the likely workings of the mind of appellant from the time he was stopped in Mobile by Officer Rothe, while he was at police headquarters, when he apparently attempted to escape, during the time his hotel room was in the process of being searched, and from then on until his trial in this case. It is to be noted that, although his appointed counsel pressed the contention that the rulings of the District Court of Mobile County should be dispositive in his favor on the motion to suppress the evidence, the proposition was conceived in the mind of defendant, which suggests a deeper consideration of his weird behavior during the entire time.
Items in the record show that on May 18, 1979, a considerate letter was written him by one of the judges of the District Court of Alabama, Mobile County, in acknowledgement of a letter written by him relative to what occurred in the two cases against him in that court. The record does not show a copy of the letter from defendant, but it is clear that it was written while he was in jail in Bibb County by virtue of a warrant of arrest for the burglary here involved and for which he was afterwards indicted by the grand jury of Bibb County. It was also obviously written before May 16, 1979, at which time he first appeared before the District Court of Bibb County in connection with a request for bond and at which time an attorney was appointed for him. The reply to his letter shows that the transcripts of the records or proceedings in the District Court of Mobile County were sent to the authorities in Bibb County, which apparently were the same as those contained in the record on this appeal.
In attempting to arrive at a correct decision as to whether a consent to search has been voluntarily, intelligently and knowingly given, and in viewing the wholeness of all the circumstances, perhaps there is no more important factor to be considered than that pertaining to the intelligence, experience and activities of the one giving the consent. In considering them here, we find from the record that appellant was thirty-five years of age, that Cottingham was twenty-one years of age, that from the time appellant reached approximate maturity, even before he was nineteen years of age, *Page 1075 
and until the burglary in the instant case, he had been in prison more than out of prison, nine years in state prison and three years in federal prison. On November 7, 1960, he was sentenced in Mobile County to ten years for robbery in each of two cases. He escaped in 1963 or 1965. He had been arrested so many times that he didn't remember the number. In 1974 he was charged with burglary, second degree, and possession of marijuana in Mobile, which charges were dismissed. His record was noteworthy not only for the number of his convictions but also for the large number of prosecutions in which he had succeeded in preventing convictions.
To any contention that the circumstances show a mistreatment of defendant by Officer Rothe, any effort by him to mislead appellant, or take an advantage of him, the answer is that the weight of any machinations weigh heavily in favor of appellant. It is not to the discredit of Officer Rothe and his partner that they did not always know what they were doing in their handling of the situation; instead of defendant's being in their hands, they were largely in his hands — a trained and experienced criminal, whose every move was to weave a web around them in order to escape the penalty of the law. To any conjecture that the officer and appellant were engaging in a "cat and mouse game," the answer is plain that appellant was the cat. More reasonable than any contention that he did not voluntarily, intelligently and knowingly give his consent to the search of his hotel room, is the conclusion that he measured with cunning and care every move he made, every thing he said and did. It is transparent that he well understood that which is not merely a shield for the innocent but which at times can be a weapon for deliverance of the criminal, and with his experience he was able to devise a scheme that to his mind could well have been better for him than by acting otherwise.
It cannot be reasonably doubted that appellant knew that without his consent, there would have been no warrantless search of his room and eventually the officers would have obtained a warrant for the search. He well knew that by bargaining with the officers so as to go with them to the room to search it, he would have some chance to clandestinely dispose of the packet of marijuana therein. He further had reason to believe that as the officers had not put together the jigsaw puzzle as to the identity of defendant and Cottingham, they had no idea that there had been any burglary in Bibb County. The fact that the officers placed the property involved in the motion to suppress, in the property room, instead of then seizing it as evidence, conclusively demonstrates that they knew far less than he did about the matters involved. He also knew that any search without a warrant posed problems for the prosecution and that there was a possibility that if the search revealed evidence of criminality, he had some chance of thwarting prosecution and escaping punishment. He succeeded as to the felony prosecution for the possession of marijuana and the charge of buying, receiving or concealing stolen property. Even as to his purported attempt to escape while at the Mobile Jail, there is good reason to believe that even this was a ploy. He was more the Artful Dodger of Charles Dickens than one of the "Innocents Abroad" of Mark Twain. The trial court was not in error in overruling the motion to suppress and in admitting over defendant's objection the calculator and the typewriter taken during the course of the burglary in Bibb County, according to the direct evidence of appellant's accomplice and the undisputed strong circumstantial evidence presented by the witnesses.
To avoid any misunderstanding, it should be stated that portions of the transcript and record referred to above as to appellant's criminal record and related matters, were brought out in an in camera proceeding by the defendant himself, in connection with an appeal to the court by his appointed attorneys for light on the matter of some differences between defendant and his attorneys as to the conduct of his defense. It was made clear therein that defendant had not taken the advice of counsel to entertain consideration of possible plea bargaining arrangements. *Page 1076 
Notwithstanding such differences and an effort on the part of defendant's counsel to be permitted to withdraw as counsel, the record shows that defendant thereafter made it known that he wanted his appointed attorney to remain in the case. The odds against appellant's acquittal were overwhelming, which his appointed attorney recognized and advised appellant accordingly. Appellant, as are all defendants in criminal cases, was entitled to competent counsel, which he obviously had and makes no contention to the contrary. No defendant is entitled as of right to a Houdini to extricate him from a prison fashioned by the defendant's own hands and chains.
We find no error in the record prejudicial to the defendant. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge Leigh M. Clark, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur.
 ON REHEARING
Appellant's only ground of his application for rehearing is as follows:
 "The Court did not consider the applicability of the doctrine of res judicata in considering the present appeal as it should have since prior decisions had held that the evidence seized in Mr. Mitchell's motel room was illegally seized."
We noted in the opinion on original submission that it appeared that on the trial of the instant case, in insisting that there was an illegal search of his hotel room and seizure of some of the stolen property, defendant contended that the mentioned rulings or judgments of the District Court of Mobile County required a similar ruling or judgment in the instant case; that defendant did so "by analogizing the situation to those in which a defendant has prevailed on principles of resjudicata, collateral estoppel, former jeopardy, autrefoisacquit or the like." We further said that appellant did not present such contention on appeal and that it could be better considered and determined after receiving the respective views of the parties on the subject. In his brief in support of the application for rehearing, which we invited, counsel, with commendable alacrity and dedication to his client, sets forth clearly and understandably the basis of the position taken by him in the trial court.
In relying upon principles of res judicata and collateral estoppel as applied to criminal cases, appellant states:
 "That the issue in the case at bar is identical to the one determined in Mobile County is clear. Both cases involved the question of the legality of the Defendant's arrest and the subsequent search of his hotel room. This issue was adjudicated by the Court in Mobile County when it ruled to suppress the evidence in question as being improperly and illegally seized. That this ruling is a final determination of the issue is evidenced by the dismissal of the subsequent prosecution of the Defendant, on the charge, in Mobile County. Consequently, as the same issue as was determined by the Court in Mobile County is now in contention in the court in Bibb County, the Mobile court's ruling must be controlling. The requirements of res judicata have been met and the trial court in Bibb County was barred from re-litigating the same issue and should have applied the determination previously made. Therefore, the evidence, previously found to be illegally and improperly seized, should have been excluded."
If for no other reason, the contention of appellant must fail for the reason that the District Court of Mobile County did not have jurisdiction to determine the guilt or innocence of the defendant in either of the two cases in that court. The record before us affirmatively shows that the particular case as to the marijuana charge in the District Court of Mobile *Page 1077 
County was a felony case. Whether the particular case in the District Court of Mobile County for buying, receiving, or concealing stolen property was a felony is not affirmatively and conclusively shown by the record before us, but it is reasonably clear that it was, for, in defendant's motion in the instant case it is shown that the hearing in such case, as well as in the marijuana case, was a "preliminary hearing." Code of Alabama 1975, § 12-12-32 provides:
 "(a) Misdemeanors. — The district court shall have exclusive original trial jurisdiction over prosecutions of all offenses defined by law or ordinance as misdemeanors, except:
 "(1) Prosecutions by municipalities having municipal courts;
 "(2) Any such prosecution which also involves a felony offense which is within the exclusive jurisdiction of the circuit court, except as the district court is empowered to hold preliminary hearings with respect to felonies and to receive guilty pleas as provided in subsection (b) of this section; and
 "(3) Any misdemeanor for which an indictment has been returned by a grand jury.
"(b) Felonies.
 "(1) The district court may exercise original jurisdiction concurrent with the circuit court to receive pleas of guilty in prosecutions of offenses defined by law as felonies not punishable by sentence of death.
 "(a) The district court shall have jurisdiction to hold preliminary hearings in prosecutions for felonies as provided for in Title 15 of this Code."
Principles of res judicata and collateral estoppel in criminal cases cannot conceivably be extended so as to apply to situations in which the judicial ruling or judgment had been made or rendered in a different case between the same parties unless principles of former jeopardy would be applicable if the case were the same case as the one in which the ruling had been made or the judgment rendered.
 "Unless otherwise provided by statute, the discharge of accused by the examining magistrate on the preliminary hearing neither annuls the indictments nor blots out the offense, and is no bar to another examination or to a subsequent prosecution for the same offense, and the fact that the examining magistrate dismisses certain counts of the complaint does not preclude the trial court from trying him on such counts, or on other counts not dismissed. A fortiori is this true where accused is discharged on the first arrest without any evidence being produced or offered. By statute, however, it may be provided that, after discharge on preliminary examination, no further prosecution of the offense shall be had." 22 C.J.S. Criminal Law § 347.
In Collins v. Loisel, 262 U.S. 426, 43 S.Ct. 618,67 L.Ed. 1062 (1922) it was held:
 ". . . The preliminary examination of one arrested on suspicion of a crime is not a trial; and his discharge by the magistrate upon such examination is not an acquittal. Com. v. Rice, 216 Mass. 480, 104 N.E. 347; People v. Dillon, 197 N.Y. 254, 256, 90 N.E. 820, 18 Ann.Cas. 552. . . ."
In State v. Vaughan, 121 Ala. 41, 42, 25 So. 727 (1898) per McClellan, C.J., we find:
 "We do not think an extended discussion of this case is necessary. We are of the opinion that the point involved here is determinable against the petitioners for the writ of habeas corpus upon what is said in the case of Ex parte Robinson, 108 Ala. 161, 18 So. 729. It may be that what is there declared bearing upon the precise question presented here was not necessary to the decision of that case, and hence was in a sense dictum; but whether necessary to that case or not, it is necessary to this, and as we are fully impressed with the soundness of the principle as there expounded, we adopt that exposition as the law of this case. It is there said, as has been several times directly adjudged by this court, that no plea of former conviction, or former acquittal, or former jeopardy can be predicated upon a preliminary hearing or its result. . . ." *Page 1078 
The case of State v. Fahey, S.D., 275 N.W.2d 870 (1979) is directly in point and fatal to appellant's contention. In that case, a magistrate "in the first preliminary hearing" had discharged Fahey for the reason there was no valid arrest as the arresting officer did not have probable cause to stop Fahey. Fahey argued that such determination "[was] binding on the circuit court." The court held:
 "Fahey's contention, however, is without merit. The purpose of a preliminary hearing is to ascertain whether a public offense has been committed and whether there is sufficient cause to believe the defendant is guilty thereof. SDCL 23-27-16. The preliminary hearing does not place a defendant in jeopardy. United States v. Levy, 268 U.S. 390, 45 S.Ct. 516, 69 L.Ed. 1010 (1924); People v. Riley, 72 Mich. App. 299, 249 N.W.2d 397 (1977). No verdict flows from the magistrate's determination; the magistrate's ruling is not a final judgment of a court. State v. Heisinger, S.D., 252 N.W.2d 899
(1977); State v. Wagner, 86 S.D. 382, 196 N.W.2d 360
(1972). If, as happened here, the magistrate fails to find that a crime has been committed, that determination is not an adjudication of the matter. Fugate v. Ronin, 167 Neb. 70, 91 N.W.2d 240 (1958). Nor is that determination a bar to further prosecution on another complaint charging the same offense. State v. McCombs, 164 Kan. 334, 188 P.2d 922
(1948)."
For the reasons stated, the application for rehearing should be overruled.
OPINION EXTENDED.
APPLICATION FOR REHEARING OVERRULED.
All the Judges concur.